J-S27035-21

2022 PA Super 12

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
                                          :           PENNSYLVANIA
                                          :
                v.                   :
                                          :
JAMES MANASSEH GILBERT        : 
                                          :
         Appellant       :   No. 37 WDA 2021

Appeal from the Judgment of Sentence Entered December 20, 2019
In the Court of Common Pleas of Erie County Criminal Division at No(s):
CP-25-CR-0002794-2018

BEFORE:   OLSON, J., NICHOLS, J., and COLINS, J.[*]

OPINION BY COLINS, J.:                 **FILED: JANUARY 25, 2022**

Appellant, James Manaseeh Gilbert, appeals from the judgment of sentence following his conviction of first-degree murder[1] and related offenses. We affirm.

The evidence at trial was as follows. Appellant and Marinda Matasowski ("the victim") were parents to a son, J.M., who was one-year old at the time of his mother's death. On the evening of August 2, 2018, the victim called her mother, Kimberly Lobaugh, and Ms. Lobaugh agreed to babysit J.M. during the victim's overnight shift as a certified nursing assistant at a hospital.

The victim and Appellant arrived at Ms. Lobaugh's home shortly after 10 p.m. and brought J.M. inside. Upon entering, Appellant asked Ms. Lobaugh

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. § 2502(a).

"[c]an we go downstairs and talk?" N.T., 11/4/19, at 60. The victim then handed J.M. to Ms. Lobaugh and the four of them walked downstairs into the bottom floor of Ms. Lobaugh's split-level home. Sensing something was wrong from Appellant's behavior, Ms. Lobaugh asked Appellant "[w]hat's going on?" and stated "[w]hatever is wrong, whatever's going on, we can try to work it out." *Id.* at 63. Appellant then stated, "I just want to talk to [the victim] and tell her that I love her" and asked her to go upstairs with J.M. *Id.* at 64-65.

Soon after leaving Appellant and the victim alone downstairs, Ms. Lobaugh heard her daughter scream. Ms. Lobaugh went downstairs and saw Appellant with a knife in his hand stabbing himself in his chest and the victim laying on the floor. Appellant said to Ms. Lobaugh "I don't know why I did it" and hugged her and J.M. *Id.* at 67.

Patrick Matasowski, the victim's brother who lived with Ms. Lobaugh, came downstairs from his room after hearing his mother scream. As he was walking down the stairs, he saw Appellant coming upstairs from the lower level with blood on his clothing and saying that he had to go to the hospital. Mr. Matasowski accompanied Appellant out to the victim's car to drive him to the hospital. Mr. Matasowski then returned to the house to get the keys to the car whereupon he discovered that the victim was severely injured. Mr. Matasowski removed J.M. from the room where the stabbing had occurred and returned to help provide first aid to his sister.

Officer Mark Fritz of the Millcreek Township Police Department was the first officer to respond to the scene. When he arrived, Appellant was outside

of Ms. Lobaugh's house by the garage.  Officer Fritz described Appellant as having a "[v]ery calm, focused" demeanor.  N.T., 11/5/19, Vol. I, at 74.  Upon noticing the blood on Appellant, Officer Fritz asked Appellant if he was injured.  Appellant informed the officer that he had stabbed himself in the chest.  Officer Fritz then asked Appellant whether he had a weapon, to which Appellant responded, "I think I killed her, she's in there, she's the devil."  **Id.**  Other officers responding to the scene discovered a 12-inch-long blood-stained kitchen knife in close proximity to the victim's body and determined that the brand of the knife was consistent with the kitchen knife set in the apartment Appellant and the victim shared.

Appellant was charged with general criminal homicide, aggravated assault, reckless endangerment, and possessing an instrument of crime.[2]  He proceeded to a jury trial in November 2019.  The trial court charged the jury as to first- and third-degree murder and further instructed the jury as to a defense of diminished capacity due to voluntary intoxication, which could reduce the murder conviction from first-degree to third-degree murder but would not serve as a defense to any other charge.  N.T., 11/6/19, at 120-25.  On November 6, 2019, a jury convicted Appellant of first-degree murder, aggravated assault, reckless endangerment, and possessing an instrument of

_____

[2] 18 Pa.C.S. §§ 2501, 2702(a)(1), 2705, and 907(a), respectively.

crime. On December 20, 2019, the trial court sentenced Appellant to a term of imprisonment of life without parole. Appellant's timely appeal followed.[3]

Appellant raises four issues in this appeal. First, Appellant argues that the trial court improperly barred the testimony of a psychiatrist who treated Appellant for mental health issues at Erie County Prison, following Appellant's arrest. Second, Appellant contends that the trial court abused its discretion by allowing the Commonwealth to call a rebuttal witness to testify about her experience of smoking marijuana that had been found in Appellant's apartment after Appellant had testified that he was experiencing ill effects from smoking marijuana at the time of the stabbing. Third, Appellant argues that the trial court abused its discretion by permitting testimony regarding incidents of domestic violence between Appellant and the victim on the theory that Appellant had "opened the door" to such testimony. Finally, Appellant asserts that the trial court abused its discretion by permitting the Commonwealth to introduce evidence of his September 11, 2018 summary harassment conviction.[4]

---

[3] Appellant filed his concise statement of errors complained of on appeal on February 12, 2020, and the trial court filed its Pa.R.A.P. 1925(a) opinion on April 8, 2020.

[4] In his statement of questions, Appellant raises a fifth issue related to the admission, over Appellant's objection, of autopsy photographs during the testimony of the Erie County Coroner. Appellant's Brief at 3-4. However, in the argument section of his brief, Appellant states that the admission of the autopsy photographs was squarely within the trial court's discretion and the issue was only raised "based upon emotion and belief of the defendant; but

The issues presented in this appeal each relate to evidentiary rulings made by the trial court. "The admissibility of evidence is a matter within the sound discretion of the trial court and will be reversed only where there is a clear abuse of discretion." **Commonwealth v. Clemons**, 200 A.3d 441, 474 (Pa. 2019) (citation omitted). The trial court will be found to have abused its discretion only where its "judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will." **Commonwealth v. Lekka**, 210 A.3d 343, 354 (Pa. Super. 2019) (citation omitted).

Appellant first argues that the trial court abused its discretion by prohibiting Dr. Sean Su, a psychiatrist employed part-time by Erie County Prison, from testifying regarding his treatment of Appellant in the weeks following his arrest. While Appellant acknowledges that Dr. Su would not meet the standard necessary for him to testify as an expert with respect to a diminished capacity defense, Appellant contends that Dr. Su would have provided relevant testimony as a fact witness regarding his diagnosis of Appellant with psychosis and major depressive disorder and Appellant's

---

undersigned counsel cannot in good conscience further [the] argument." **Id.** at 23. Therefore, Appellant "conceded" the issue and "removed [it] from [this Court's] consideration." **Id.** at 4 (emphasis omitted). As counsel has abandoned this issue for the purpose of this appeal, we will not address it further. **See Commonwealth v. Williams**, 141 A.3d 440, 471 (Pa. 2016) ("Appellate counsel need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal.") (citation omitted).

reports of auditory hallucinations and other mental health symptoms. Because the Commonwealth charged Appellant with criminal homicide generally and instructed the jury that they could find him guilty of first-degree or third-degree murder, *see* N.T., 11/6/19, at 120, Appellant asserts that the testimony of Dr. Su regarding Appellant's mental state would be particularly relevant to the question of whether Appellant lacked the specific intent to kill necessary to show that he should be convicted of murder of the first degree. Appellant argues that the trial court's decision to preclude Dr. Su's testimony deprived Appellant of his due process right to defend himself of the criminal charges against him.

The record reveals that Appellant filed a pre-trial motion for psychological examination, in which he described Appellant's mental health history and attached various records related to his treatment. Among the records attached to this motion was an August 23, 2018 report by Dr. Su, in which he indicated that Appellant suffered major depressive disorder with psychosis and that he reported auditory hallucinations. Motion for Psychiatric[5] Examination, 5/10/19, ¶30, Exhibit 8. The trial court granted Appellant's motion.

Although an evaluation was performed, Appellant did not ultimately call the psychologist who performed the evaluation to testify at trial. Instead,

---

[5] While Appellant requested that the trial court authorize the dispersal of funds for Appellant's examination by a psychiatrist, the individual Appellant chose for the examination was a psychologist.

Appellant notified the Commonwealth that he intended to call Dr. Su. to testify about his after-the-fact diagnosis of Appellant. The Commonwealth noted its objection based upon relevance to the extent Dr. Su would provide general testimony related to Appellant's mental state but would not offer testimony that was sufficient to show that Appellant lacked capacity to kill the victim. N.T., 10/23/19, at 29-30; N.T., 11/4/19, at 11-13; N.T., 11/5/19, Vol. I, at 14-15. Appellant stated that Dr. Su would not testify regarding Appellant's state of mind at the time of the killing, nor would Appellant seek to assert a diminished capacity defense based upon a mental disorder. N.T., 10/23/19, at 30; N.T., 11/4/19, at 15; N.T., 11/5/19, Vol. I, at 13. Instead, Appellant indicated that Dr. Su would testify as a fact witness regarding his diagnosis of Appellant with major depressive disorder and psychosis approximately three weeks after the incident in question. N.T., 10/23/19, at 31-32; N.T., 11/4/19, at 13-15; N.T., 11/5/19, Vol. I, at 13-14, 16.

The trial court sustained the Commonwealth's objection. N.T., 11/5/19, Vol. I, at 25. The court explained its reasoning in its Pa.R.A.P. 1925(a) opinion as follows:

> Appellant conceded that neither Dr. Su, nor any other medical professional, would offer the requisite psychiatric testimony to support a diminished capacity defense. However, when pressed on relevancy, counsel admitted that Dr. Su's testimony would "[go] to the assertions of the Commonwealth that my client acted **deliberately, maliciously, premeditatively**." [N.T., 11/5/19, Vo. I, at 20 (emphasis supplied).]
>
> There is no difference between the stated proffer and the defense of diminished capacity. First degree murder is a homicide "committed by an intentional killing." 18 Pa.C.S.[] §2502(a). An

"intentional killing" is a "[k]illing by means of poison, or by lying in wait, **or by any other kind of willful, deliberate and premeditated killing.**" 18 Pa.C.S.[] §2502(d) (emphasis supplied). By counsel's own admission, the proffered evidence would have put Appellant's capacity to commit an intentional killing at issue without providing the requisite supporting psychiatric evidence. Accordingly, Dr. Su's testimony was correctly excluded.

Trial Court Opinion, 4/8/20, at 6.

A defense of diminished capacity is "an extremely limited defense" where a defendant admits criminal liability generally but seeks to mitigate a first-degree murder charge to third-degree murder. *Commonwealth v. Hutchinson*, 25 A.3d 277, 312 (Pa. 2011). "To establish a diminished capacity defense, a defendant must prove that his cognitive abilities of deliberation and premeditation were so compromised, by mental defect or voluntary intoxication, that he was unable to formulate the specific intent to kill." *Id.* In this case, Appellant conceded that Dr. Su's testimony could not be used to establish a diminished capacity defense based upon a mental defect as he would not testify that Appellant suffered from a mental disorder affecting his cognitive functions on the date he stabbed the victim. *See id.* ("[D]iagnosis with a personality disorder does not suffice to establish diminished capacity."); *Commonwealth v. Vandivner*, 962 A.2d 1170, 1183 (Pa. 2009) ("[P]sychiatric evidence that a defendant lacked the ability to control his actions or that he acted impulsively is irrelevant and inadmissible on the issue of the defendant's specific intent to kill.") (citation omitted).

Even though Dr. Su's testimony would not support a diminished capacity defense, Appellant argued that the psychiatrist's diagnosis of Appellant with major depressive disorder and psychosis would be "highly relevant to whether a jury convicts [Appellant] or not on [] first[-] or third[-]degree" murder. N.T., 11/5/19, Vol. I, at 14. When asked by the trial court how Dr. Su's testimony would be relevant if not under a diminished capacity theory, Appellant stated that such evidence was relevant to whether the Commonwealth met its "burden to prove that it was a deliberate, malicious, premeditated murder." *Id.* at 17; *see also id.* at 20. However, as the trial court aptly concluded, Appellant's proffer was nearly identical to the role that psychiatric evidence plays in a diminished capacity defense to show that the defendant lacked the mental capacity of premeditation and deliberation such that he could not form a specific intent to kill. Trial Court Opinion, 4/8/20, at 6; *Hutchinson*, 25 A.3d at 312. To allow Appellant to submit psychiatric evidence bearing on his specific intent to kill without that evidence meeting the diminished capacity standard laid out by our Supreme Court would "create confusion with the jury," as the trial court stated. N.T., 11/5/19, Vol. I, at 22-24; *see* Pa.R.E. 403 (providing that the court may exclude relevant evidence if its probative value is outweighed by a danger of, *inter alia*, "confusing the issues" or "misleading the jury"). Moreover, such confusion would be compounded in this case where Appellant testified that he consumed possibly tainted marijuana a few hours before the stabbing incident, and the

trial court instructed the jury as to a diminished capacity defense based upon voluntary intoxication. N.T., 11/6/19, at 124-25.

In light of the circumscribed use of psychiatric testimony in murder cases and Appellant's failure to proffer a basis for the admission of Dr. Su's testimony distinguishable from the diminished capacity defense, we discern no abuse of discretion in the trial court's exclusion of Dr. Su's testimony. *See Commonwealth v. Ventura*, 975 A.2d 1128, 1140-41 (Pa. Super. 2009) (affirming trial court's determination that psychiatric testimony of a defendant's "life history and his psychological issues since incarceration, rather than his state of mind at the actual time of the crime" was irrelevant as they would not support either a diminished capacity defense or a theory of self-defense). Appellant's first issue thus merits no relief.

Appellant next argues that the trial court abused its discretion by permitting Miranda Will to testify as a rebuttal witness regarding her condition after smoking marijuana that was taken from the apartment shared by Appellant and the victim three days after the victim's death. Appellant contends that this evidence was not relevant as it "bore zero bearing on the facts at issue in the trial" as "[n]o connection whatsoever was made between the marijuana Ms. Will smoked and the marijuana [A]ppellant smoked the night of the homicide." Appellant's Brief at 20-21. Therefore, Appellant asserts that Ms. Will's discussion of the effects of the marijuana was not permitted as lay opinion testimony under Pennsylvania Rule of Evidence 701 as her testimony was not relevant to the issues under consideration by the

jury. *See* Pa.R.E. 701(b) (stating that lay opinion testimony is permitted only when it is "helpful to clearly understanding the witness's testimony or to determining a fact in issue").

Prior to trial, counsel for Appellant indicated to the court that he intended to present evidence that he became delirious prior to stabbing the victim as a result of smoking potentially tainted marijuana; Appellant therefore requested that the Commonwealth preserve and analyze any marijuana it had collected during the police investigation. N.T., 3/20/19, at 3-4; N.T., 10/23/19, at 34-35. Three quantities of marijuana—two on Appellant's person and one in the victim's vehicle—were recovered and each was tested and determined to contain only marijuana and no other controlled substance. N.T., 10/23/19, at 35; N.T., 11/5/19, Vol. I, at 60-64. Defense counsel stated at a subsequent pre-trial hearing that the Commonwealth likely had not tested the potentially tainted marijuana he had smoked that evening because he had smoked a marijuana blunt[6] at home and left it there on an end table. N.T., 3/20/19, at 3-4,11-14; N.T., 10/23/19, at 35. Ms. Will later learned about the discussion of the tainted marijuana in the apartment through a friend who had attended that pre-trial hearing, and she contacted the victim's mother, Ms. Lobaugh. N.T., 11/6/19, at 66-67. Ms. Will told Ms.

---

[6] According to Ms. Will, "[a] blunt is a cigar that is broken down and emptied out so that we can replace the nicotine with marijuana"; the marijuana is then rerolled and sealed inside the cigar paper before it is smoked. N.T., 11/6/19, at 62.

Lobaugh that she and her boyfriend, Cody Perry, went into the apartment after the victim's death in order to obtain a keepsake of the victim with Ms. Lobaugh's consent, and Mr. Perry found a blunt in the apartment, which the two then smoked. N.T., 10/23/19, at 36-37. Ms. Lobaugh reported this conversation with Ms. Will to police. *Id.* at 37.

Upon learning of the Commonwealth's intention to call Ms. Will as a witness regarding the smoking of the blunt, Appellant filed a motion *in limine* seeking to exclude any potential testimony by Ms. Will or Mr. Perry as they lacked any expertise to ascertain whether the marijuana was tainted with any other substance. The trial court ruled at a pre-trial hearing that if Appellant testified that after smoking the potentially tainted blunt his mental processes were altered beyond what he normally would have experienced when consuming marijuana, the testimony of Ms. Will or Mr. Perry would be relevant on rebuttal. *Id.* at 40-41.

At trial, Appellant testified that he was a regular marijuana smoker and that he "rolled up" marijuana in a blunt and smoked it on the evening of August 2, 2018. N.T., 11/5/19, Vol. II, at 67-68, 118-19. Appellant testified that the marijuana "didn't make me feel normal" and that he "thought something was in it because" "it wasn't like [] normal" marijuana. *Id.* at 68, 120. Appellant stated that, after smoking, he thought he heard voices outside and that someone was watching him from outside the apartment and that he continued to feel the experience of being watched and being watched up until the point that he stabbed the victim. *Id.* at 69-71, 79. Appellant stated that

he was not sure whether the marijuana he smoked that evening was the same as that found by police on his person as he had changed clothes prior to driving with the victim to Ms. Lobaugh's house. *Id.* at 68-69, 120-21. Appellant further stated that the marijuana blunt taken from his apartment by Ms. Will and Mr. Perry could have been the same marijuana he smoked a few hours before stabbing the victim, although he could not be certain. *Id.* at 121-23.

After the defense rested, the Commonwealth called Ms. Will as a rebuttal witness. Ms. Will testified that she went to the apartment shared by the victim and Appellant three days after the victim's death to collect mementos, and during that visit, Mr. Perry found the partially smoked blunt in the apartment. N.T., 11/6/19, at 58-61. Ms. Will stated that she and Mr. Perry smoked the blunt while they drove back from the apartment. *Id.* at 63. Ms. Will testified that she regularly smoked marijuana and that after smoking the blunt she "felt the normal high that [she] usually [experienced] from marijuana which would be kind of mellowed out, . . . kind of in a better mood, relax[ed]" and hungry. *Id.* at 63-64. Ms. Will stated that she felt no unusual effects and she was able to drive fine. *Id.* at 64. In addition, Ms. Will stated that she did not notice any unusual behavior from Mr. Perry, who was also a regular marijuana smoker, after smoking. *Id.* at 64-65.

"[T]the admission of rebuttal testimony is within the sound discretion of the trial court, and the appropriate scope of rebuttal evidence is defined by the evidence that it is intended to rebut." *Commonwealth v. Yocolano*, 169 A.3d 47, 56 (Pa. Super. 2017) (quoting *Commonwealth v. Ballard*, 80

A.3d 380, 401 (Pa. 2013)). Evidence is generally admissible "if it is relevant—that is, if it tends to establish a material fact, makes a fact at issue more or less probable, or supports a reasonable inference supporting a material fact—and its probative value outweighs the likelihood of unfair prejudice. *Clemons*, 200 A.3d at 474 (citation omitted); *see also* Pa.R.E. 401 ("Evidence is relevant if:  (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."). Pursuant to Pennsylvania Rule of Evidence 701, a lay witness may testify in the form of an opinion when the testimony is:

> (a) rationally based on the witness's perception;
>
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
>
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702[, relating to opinion testimony by an expert witness].

Pa.R.E. 701.

It is well-established that a witness may offer lay opinion testimony regarding another's readily physical condition or appearance, where the opinion does not require medical or specialized training. *See, e.g.*, *Commonwealth v. Gause*, 164 A.3d 532, 538 (Pa. Super. 2017) (*en banc*). This case requires our consideration of a different question:  may a lay witness offer an opinion about whether their **own** mental and physical condition remained consistent across several instances when they consumed what they understood to be the same drug.

- 14 -

Upon review, we see no abuse of discretion in the trial court permitting Ms. Will to testify about her condition after smoking the partially smoked blunt and comparing her experience to prior instances in which she had smoked marijuana. Ms. Will's testimony established that she was a regular marijuana smoker, and therefore she was familiar with the feeling of intoxication from ingesting that substance. N.T., 11/6/19, at 63-64. She then testified regarding her own perception of the effects of smoking the blunt as compared to prior instances when she had smoked marijuana, finding no discernable difference on the date in question. *Id.* at 64; *see* Pa.R.E. 701(a). Ms. Will did not offer an opinion relying on scientific, technical, or other specialized knowledge, but instead her testimony was based solely upon her comparison of her reactions to different occasions where she had smoked marijuana. *See* Pa.R.E. 701(c). Furthermore, Ms. Will was permitted to offer her lay opinion that Mr. Perry, her boyfriend, did not exhibit any unusual behavior following his smoking of the blunt, such as mumbling, delirium, or not being able to follow a conversation. N.T., 11/6/19, at 64-65; *see also Gause*, 164 A.3d at 538.

Moreover, the trial court did not abuse its discretion in determining that Ms. Will's testimony regarding her experiences after smoking the blunt was relevant as rebuttal to Appellant's testimony regarding the unusual effects he felt at the time of the stabbing that he believed were brought on by smoking marijuana. Appellant testified that the blunt he rolled and smoked a few hours prior to stabbing the victim made him feel not "normal" and he insinuated that

it may have been laced with some other unknown psychoactive substance. N.T., 11/5/19, Vol. II, at 68, 120. In addition, Appellant requested and was granted a jury instruction based upon a defense of diminished capacity due to voluntary intoxication. N.T., 11/6/19, at 124-25. While Appellant's statements concerning what he did with the remainder of the potentially tainted marijuana were vague and inconclusive, he did not rule out that he left the marijuana at home and his testimony that he smoked it in a blunt form at home was consistent with Ms. Will and Mr. Perry finding a blunt in the apartment. As the blunt was smoked and not turned over to the police, the Commonwealth was not able to test it to determine its chemical composition. Therefore, Ms. Will's testimony was directly responsive to Appellant's testimony and served to rebut his defense based upon his testimony that the marijuana he smoked induced a violent episode. **See Yocolano**, 169 A.3d at 56. Having found that Ms. Will's testimony was relevant and permissible lay opinion testimony, we therefore find no merit in Appellant's second appellate issue.

In his third issue, Appellant argues that the trial court abused its discretion by permitting the Commonwealth to offer "hearsay evidence relating to alleged domestic violence perpetrated by [A]ppellant" through the testimony of "virtually every [Commonwealth] witness." Appellant's Brief at 32. Appellant contends that the Commonwealth was "given license to explore domestic violence allegations unfettered" following the trial court's ruling during the testimony of Ms. Lobaugh, the Commonwealth's first witness and

the victim's mother, that Appellant had opened the door to her testimony relating to the victim's reports of previous abusive behavior by Appellant. ***Id.*** at 34. Appellant asserts that this ruling "changed the nature and course of the entire trial," resulting in violations of Appellant's rights under the confrontation clause as he was not able to cross-examine the victim at trial, the ultimate source of these hearsay domestic violence reports. ***Id.*** at 35.

Initially, we note that while Appellant argues that the purportedly improper testimony regarding domestic violence permeated the trial, he only cites to one specific portion of the testimony of Ms. Lobaugh in his appellate brief. In fact, Appellant does not even reference the names of the other witnesses who he claims made objectionable references to domestic violence incidents. Our appellate rules require that an appellant who refers to evidence of record in his brief must include "a reference to the place in the record where the matter referred to appears." Pa. R.A.P. 2119(c). An appellant's failure to properly develop an argument with citations to the relevant portions of the record will result in the waiver of his appellate claims. ***See Commonwealth v. Brown***, 200 A.3d 986, 991 (Pa. Super. 2018) ("In order for this Court to determine whether [the appellant] was prejudiced by the trial court's adverse ruling on his motion *in limine*, he must, at a minimum, direct us to the specific places in the record where allegedly prejudicial testimony was elicited."); ***see also Commonwealth v. Mulholland***, 702 A.2d 1027, 1034 n.5 (Pa. 1997) ("In a record containing thousands of pages, this court will not search every page to substantiate a party's incomplete argument."). As Appellant has

identified only the testimony of one witness who testified as to domestic violence between himself and the victim—that of Ms. Lobaugh—we will confine our discussion to this one instance of purportedly improper testimony.[7]

In her direct examination, Ms. Lobaugh stated that "a lot of arguments, a lot of fights" took place between the victim and Appellant during the latter part of 2017. N.T., 11/4/19, at 46. Ms. Lobaugh also discussed a period of a few months when Appellant was living in another state and the victim was "a lot more relaxed" and less "on edge." *Id.* at 48-49. The prosecutor then drew Ms. Lobaugh's attention to an "incident" or "fight of sorts" in June of 2018 that caused the victim to pack all of her belongings and move in with her before finally going back to live with Appellant a few weeks later. *Id.* at 51-52. No objection was lodged by the defense to any of these statements.

_____

[7] Appellant's sole arguable citation to other objectionable trial testimony is his reference to the "witnesses listed off by the [t]rial [c]ourt in its [Pa.R.A.P.] 1925 [o]pinion," who Appellant states "all made allegations that [A]ppellant was harming [the victim] throughout their relationship with impunity." Appellant's Brief at 42. In its opinion, the trial court discussed three other Commonwealth witnesses who testified as to domestic violence incidents between Appellant and the victim: Ms. Will, Carly Blanks, and Danielle Burhenn. Trial Court Opinion, 4/8/20, at 15-17. However, as the trial court noted, Appellant did not object to the relevant portions of Ms. Will's, Ms. Blank's, and Ms. Burhenn's testimony, and therefore he waived any potential appellate challenge to their testimony. *Id.* While Appellant asserts in his brief that he lodged a general objection prior to trial to any hearsay testimony that would imply that he abused the victim, *see* Appellant's Brief at 35 (citing N.T., 11/4/19, at 5, 11), Appellant's failure to cite to the challenged portions of the trial transcript in his brief or even reference the names of the witnesses who offered allegedly improper testimony obviates any need by this Court to address any other testimony beyond the specifically referenced portions of Ms. Lobaugh's testimony. *Brown*, 200 A.3d at 991.

During cross-examination of Ms. Lobaugh, defense counsel initiated the following two exchanges:

Q. Okay. And up to that point -- I don't want to belabor the point, but up to that point you never knew of any issues or troubles in the relationship at that point, correct?

A. Yes, there were.

Q. There were?

A. Yes.

Q. Normal boyfriend /girlfriend issues or?

A. Yeah, I think it went a little beyond that, but yes, **there was arguing, fighting.**

\* \* \*

Q. Okay. Now, [did] you and [Appellant] ever have discussion about the relationship between he and [the victim]?

A. Yes, I have.

Q. What type of discussion did you have?

A. Depending on what was going on at the time, **there was a lot of arguments, a lot of fighting going on**, and he wanted me to say she was wrong. And yes, just a lot of discussion as to whose fault started what.

Q. And it was a lot of, I guess, **would you agree, a lot of arguments were pretty meaningless, small things blown out of proportion?**

A. **At times.**

*Id.* at 74, 78-79 (emphasis added).

During redirect, the prosecutor questioned Ms. Lobaugh as follows:

Q. [Y]ou were asked by [defense counsel] about the relationship between [Appellant] and your daughter, and he described -- he used the term that they had some minor fights. Do you recall him asking you that?

A. Yes, I do.

Q. And I think you said well, some, but it went beyond that.

A. Yes, it did.

Q. Okay. Can you describe what you mean when you say that the arguments that they had went beyond the minor incidents that [defense counsel] talked about?

A. **I received many, many phone calls from her crying as she had been hit, beat up.**

*Id.* at 102 (emphasis added). Defense counsel objected, but the trial court

ruled that he had "opened this door" during his cross-examination of Ms.

Lobaugh. *Id.* at 102-03. The questioning continued as follows:

Q. Go ahead.

A. **She would call crying, very upset, crying, saying that she had been hit or beat up.**

*Id.* at 103 (emphasis added).

The trial court did not abuse its discretion in permitting Ms. Lobaugh's

testimony on redirect over Appellant's objection. As this Court has explained,

[o]ne who induces a trial court to let down the bars to a field of inquiry that is not competent or relevant to the issues cannot complain if his adversary is also allowed to avail himself of that opening. The phrase 'opening the door' . . . by cross examination involves a waiver. If defendant delves into what would be objectionable testimony on the part of the Commonwealth, then the Commonwealth can probe further into the objectionable area.

*Commonwealth v. Lewis*, 885 A.2d 51, 54-55 (Pa. Super. 2005) (quoting

*Commonwealth v. Stakley*, 365 A.2d 1298, 1299-1300 (Pa. Super. 1976)).

Instantly, the prosecution questioned Ms. Lobaugh regarding "fights"

and "arguments" between Appellant and the victim, but without addressing

the particulars of the fights, including whether any physical abuse occurred. N.T., 11/4/19, at 46, 51. On cross-examination, Appellant then delved into whether Ms. Lobaugh understood the disputes only to be "[n]ormal" or "meaningless" and whether she had discussed with Appellant who was at fault. *Id.* at 74, 78-79. This opened the door for the Commonwealth to probe further into the objectionable nature of the domestic disputes, eliciting testimony from Ms. Lobaugh that the victim had complained that Appellant had physically struck her. *Id.* at 102-03. As the trial court explained,

> [Defense] counsel's cross-examination was intended to cast Appellant in a positive light by implying that [the v]ictim's own mother did not take [the v]ictim and Appellant's arguments seriously, when in fact that was not the case. Thus it was proper to allow the Commonwealth to probe into Ms. Lobaugh's actual opinion. [The v]ictim's statements to Ms. Lobaugh that Appellant was abusive toward her were offered not for the truth of the matter asserted, but rather as the basis for Ms. Lobaugh's true opinion of the relationship, which had been mischaracterized by Appellant's counsel's questioning. Accordingly, [A]ppellant opened the door to the testimony and the same was properly permitted.

Trial Court Opinion, 4/8/20, at 15; *see Lewis*, 882 A.2d at 55 (holding that, by cross-examining police detective about previous drug-related encounters with co-defendant, defense counsel opened the door to prosecutor eliciting more detailed description of the encounters from the detective on redirect); *Stakley*, 365 A.2d at 1299-1300 (defense attorney's cross-examination of investigator regarding his knowledge of defendant's military discharge opened the door for prosecutor to elicit testimony that the discharge was dishonorable). Accordingly, this issue does not merit the requested relief.

Finally, Appellant argues that "the trial [c]ourt abused its discretion and committed plain error by allowing the Commonwealth to enter evidence into the trial record of [Appellant's September 11, 2018] conviction for summary harassment" related to the June 2018 fight between Appellant and the victim. Appellant's Brief at 5. Appellant contends that, because the June 2018 dispute was raised during Ms. Lobaugh's testimony, he "was effectively forced to address this incident," by calling the officer who had responded to the incident as a defense witness. *Id.* at 43.

However, as the trial court recognized in its opinion, Appellant's recounting of the events related to the summary harassment conviction is inconsistent with the record. Trial Court Opinion, 4/8/20, at 17. Prior to trial, Appellant filed a motion *in limine* in which he sought to bar the Commonwealth from admitting any evidence of Appellant's prior convictions pursuant to Pennsylvania Rule of Evidence 404(b). *See* Pa.R.E. 404(b)(1) (providing that except as expressly permitted by the rule "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character"). On the morning that trial began, the trial court ruled that the Commonwealth could not admit evidence of the summary conviction. The court stated that, in light of the fact that Appellant appeared without counsel and no complaining witness was present at his September 11, 2018 trial, it was "not going to let that one go" into the record. N.T., 11/4/19, at 4, 6-7. The trial court did indicate that the Commonwealth could present evidence related to the June

2018 incident, but only to the extent that testimony was within the personal knowledge of the witnesses. *Id.* at 4-11.

As discussed above, the June 2018 incident was briefly discussed during the direct examination of Ms. Lobaugh without objection from Appellant:

> Q. Okay. So [Appellant and the victim are] now at [the apartment complex where they lived] in May of 2018. Did -- are you aware of an incident in June of 2018 between the two of them?
>
> A. Yes, I am.
>
> Q. All right. We don't have to go into particulars for the jury, but is it fair to say that it was an incident, a fight of sorts, correct?
>
> A. Yes, it was.
>
> Q. Okay. And without, again, describing the incident, what happened in terms of where [the victim] lived after that incident?
>
> A. After that incident she moved in with me.

*Id.* at 50-51. No mention was made during the testimony of Ms. Lobaugh, or indeed any other of the Commonwealth's witnesses, of criminal charges being filed based on the June 2018 incident.

The June 2018 incident arose again during Appellant's testimony. Upon questioning from his counsel, Appellant described the June 2018 incident at length and stated that, as a result, he "somehow, was convicted of harassment." N.T., 11/5/19, Vol. II, at 47-51. Appellant then called Officer Christopher Buckner of the Millcreek Township Police Department to explain his investigation of the June 2018 incident, as well as the ultimate disposition of the harassment charge against Appellant. N.T., 11/6/19, at 41-50. Officer

Buckner stated that both Appellant and the victim alleged physical abuse, but that only the victim wanted to press charges. *Id.* at 43-44, 47.

We find no merit in Appellant's argument regarding the evidence of his summary harassment conviction. To the extent Appellant challenges the trial court's ruling on his motion *in limine* seeking to exclude evidence of a prior bad act under Rule of Evidence 404(b), he prevailed before the trial court and the trial court ruled that the Commonwealth could not introduce the conviction. Furthermore, to the extent Appellant challenges Ms. Lobaugh's brief discussion of the June 2018 incident during her trial testimony, Appellant failed to object and therefore he waived his claim. N.T., 11/4/19, at 50-51. Finally, to the extent Appellant argues that he was compelled to address his conviction during his testimony, the record contradicts his claim because the Commonwealth, in compliance with the trial court's pre-trial ruling, did not initially elicit evidence related to the conviction.

As we find that none of Appellant's appellate issues merit relief, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 01/25/2022